**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **MARCELLUS POTTER, Admn.** | : | **CASE NO.** _____ |
| **Of the Estate of TASHA GRANT** | : | **JUDGE:**_____ |
| **Deceased** | : | |
| **c/o Wright & Schulte LLC** | : | |
| **130 W. Second St.  #1600** | : | |
| **Dayton, OH   45402** | : | |
| | : | |
| **Plaintiff,** | : | **COMPLAINT AND JURY DEMAND** |
| | : | **ENDORSED HEREON** |
| **Vs.** | : | |
| | : | |
| **CUYAHOGA COUNTY, OHIO** | : | |
| **c/o Richard Manoloff** | : | |
| **Law Director** | : | |
| **2079 E. Ninth St.** | : | |
| **Cleveland, OH  44115** | : | |
| | : | |
| **And** | : | |
| | : | |
| **HAROLD PRETEL, in his** | : | |
| **Capacity as Sheriff** | : | |
| **CUYAHOGA COUNTY SHERIFF'S** | : | |
| **OFFICE** | : | |
| **The Justice Center** | : | |
| **1215 W. Third St.** | : | |
| **Cleveland, OH  44113** | : | |
| | : | |
| **And** | : | |
| | : | |
| **BRANDON COFFEY** | : | |
| **The Justice Center** | : | |
| **1215 W. Third St.** | : | |
| **Cleveland, OH  44113** | : | |
| | : | |
| **And** | : | |
| | : | |
| **THE METROHEALTH SYSTEM** | : | |
| **2500 Metrohealth Dr.** | : | |
| **Cleveland, OH   44109** | : | |
| | : | |

1

And                           :
:

**JOE GREINER, in his capacity**  :
**As Chief of Police of the**  :
**METROHEALTH POLICE DEPT.**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**OFFICER TIFAUN MAZARAN**  :
**MetroHealth Police Department**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**OFFICER JARED ALEMANE**  :
**MetroHealth Police Department**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**OFFICER MICHAEL TUCCIARONE**  :
**MetroHealth Police Department**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**SANDRA NAJARIAN, M.D.**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**ANA GLAVAN, M.D.**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :
:

    **And**  :
:

**JOSUE DAVILA, M.D.**  :
**2500 Metrohealth Dr.**  :
**Cleveland, OH  44109**  :

2

|   |   |
|---|---|
| **And** | : |
|   | : |
| **WILLIAM PETRO, M.D.** | : |
| **2500 Metrohealth Dr.** | : |
| **Cleveland, OH  44109** | : |
|   | : |
| **And** | : |
|   | : |
| **AASIA SYED, M.D.** | : |
| **2500 Metrohealth Dr.** | : |
| **Cleveland, OH  44109** | : |
|   | : |
| **And** | : |
|   | : |
| **OHIO DEPARTMENT OF MEDICAID** | : |
| **30 East Broad St.  14th Floor** | : |
| **Columbus, OH  43215** | : |
|   | : |
| **And** | : |
|   | : |
| **JANE AND/OR JOHN DOES 1-10** | : |
| **Who Are Employees and/or Agents** | : |
| **Of the Cuyahoga County Sheriff's** | : |
| **Office and/or The Metro** | : |
| **Health Police Department** | : |
| **Whose identities are not known** | : |
| **At this time but shall be** | : |
| **Ascertained during discovery** | : |
|   | : |
| **And** | : |
|   | : |
| **JANE AND/OR JOHN DOES 11-20** | : |
| **Who Are Employees and/or Agents** | : |
| **Of MetroHealth System** | : |
| **Whose identities are not known** | : |
| **At this time but shall be** | : |
| **Ascertained during discovery** | : |
|   | : |
| **Defendants.** | : |

1.  This is a civil rights action seeking redress for Defendants' failure to protect Tasha

3

Grant and their objectively unreasonable response to her serious medical and psychiatric needs while she was in government custody.

2. Defendants knew, from Ms. Grant's records, prior encounters, and her statements during the relevant events, that she had significant mental-health needs and a history of suicidal threats.

3. Defendants knew Ms. Grant had been transported for chest pain and, after testing revealed a grossly abnormal echocardiogram and reduced ejection fraction, failed to respond with timely treatment or appropriate escalation of care.

4. Ms. Grant repeatedly screamed that she could not breathe, including more than twenty-three separate pleas, yet Defendants mocked her distress and continued restraining her in a prone position.

5. Defendants intentionally chose to ignore Ms. Grant's serious medical and psychiatric needs and failed to provide appropriate medical care or a safe environment for her. Instead, Defendants openly treated Ms. Grant with contempt and mocking, despite her serious medical and psychiatric needs.

6. Tasha Grant's death was unnecessary, preventable, and all too foreseeable. Had any Defendant taken appropriate action to provide treatment for her serious medical and psychiatric needs, she would not have died.

7. Defendants failed to follow their own policies, standards, and accepted custodial and medical practices concerning detainee safety, monitoring, and care.

8. Upon information and belief, Defendants had notice of prior incidents, complaints, or deficiencies involving inadequate monitoring, restraint practices, or failure to respond to detainee medical distress.

4

9. The Defendants' unconstitutional policies, practices, and customs in place at the time of this incident and their failure to properly enforce such policies, practices, and customs were the moving force propelling and sanctioning their employees' misconduct.

10. Plaintiff brings this action to seek change for other individuals who present to the Cuyahoga County Jail or the MetroHealth System with serious medical and psychiatric needs in the future. Plaintiff demands reform and justice on behalf of Tasha Grant and all others who have suffered and died because of the Defendants' intentional disregard for serious medical and psychiatric needs.

## JURISDICTION AND VENUE

11. The jurisdiction of this Court is invoked pursuant to the Civil Rights Act, 42 U.S.C. §1983 *et seq;* the Judicial Code §§1331 and 1343(a); the Constitution of the United States. Supplemental jurisdiction over related state law claims is invoked pursuant to 28 U.S.C. § 1367.

12. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, and several Defendants reside or do business here.

13. Plaintiff brings Ohio medical claims under this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Plaintiff does not concede that Ohio Civ.R. 10(D)(2) applies in federal court. The sufficiency of Plaintiff's pleading is governed by the Federal Rules of Civil Procedure, including Rules 8, 9, and 12. Plaintiff will comply with all expert-disclosure obligations imposed by the Federal Rules of Civil Procedure and this Court's case-management orders.

**PARTIES**

14. Plaintiff, Marcellus Potter, is the duly appointed Administrator of the Estate of Tasha Grant, having been appointed same by the Cuyahoga County Probate Court in Case No. 2025EST301652 on October 8, 2025.

15. Defendant Cuyahoga County is a municipal corporation located in this judicial district and, through the Cuyahoga County Sheriff and jail administration, is responsible for policies, training, supervision, and customs governing jail operations and detainee care.

16. Defendant Harold Pretel (hereinafter "Pretal") is the elected Sheriff of Cuyahoga County and, upon information and belief, was the final policymaker for jail operations, custody practices, training, supervision, and detainee-care protocols relevant to this action. Defendant Harold Pretel is named in his official capacity only to the extent necessary to identify the final policymaker for Cuyahoga County Sheriff's Office policies, customs, training, and supervision.

17. Defendant Brandon Coffey, (hereinafter "Coffey") is employed at the Cuyahoga County Sheriff's Department and at all times relevant herein, was acting within the scope of his employment and under color of state law.

18. Defendant The MetroHealth System (hereinafter "Metro Health") is an Ohio nonprofit corporation headquartered in Cleveland, Ohio, that provides hospital and related healthcare services throughout Cuyahoga County and contracts with the County to provide medical services to detainees.

19. Defendant MetroHealth also contracts with Cuyahoga County to provide medical services to inmates at the Cuyahoga County Jail.

20. The MetroHealth Police Department is a division of The MetroHealth System, and

6

Joe Greiner was, at all relevant times, the Chief responsible for its operations, training, supervision, and custodial security practices.

21. MetroHealth, its police department, and their officers acted under color of state law because they performed custodial, security, and restraint functions pursuant to state law, contractual authority, delegated public functions, and joint action with Cuyahoga County and the Sheriff's Office.

22. Defendants Tifaun Mazaran, Jared Alemane, and Michael Tucciarone (hereinafter "Mazaran", "Alemane", and/or "Tucciarone") were, at all relevant times, sworn law-enforcement officers employed by or acting through the MetroHealth Police Department. They acted under color of state law and within the scope of their employment. They are sued in their individual capacities.

23. Defendant Sandra Najarian, M.D. (hereinafter "Najarian") is a physician licensed to practice medicine in the State of Ohio and at all times relevant herein was employed in the practice of emergency medicine at the MetroHealth Medical Center.

24. Defendants Ana Glavan, M.D., (hereinafter "Glavan") Josue Davila, M.D., (hereinafter "Davila") and William Petro, M.D. (hereinafter "Petro") are physicians licensed to practice medicine in the State of Ohio and at all times relevant herein were employed in the practice of hospital medicine at MetroHealth.

25. Defendant Aasia Syed, M.D. (hereinafter "Syed") is a physician licensed to practice medicine in the State of Ohio and at all times relevant herein was employed in the practice of psychiatry at MetroHealth.

26. Defendant, Ohio Department of Medicaid (hereinafter "ODM") is an Ohio

corporation with its principal place of business in the State of Ohio. ODM may have provided health insurance benefits to Tasha Grant in connection with the treatment of injuries she suffered as a result of the actions of the other named Defendants. There is a genuine dispute with ODM with regard to the existence and/or extent of ODM's subrogation rights for health benefits paid on Tasha Grant's behalf in connection with these injuries. ODM is being added as a necessary party to this action with regard to any claimed subrogated rights.

27. Defendants Jane and/or John Does 1-10 are employees and/or agents of Cuyahoga County and/or the Cuyahoga County Sheriff's Office, whose identities are presently unknown to Plaintiff but are believed to include persons who participated in custody, transport, restraint, monitoring, or medical coordination and whose identities will be determined in discovery.

28. Defendants Jane and/or John Does 11-20 are employees and/or agents of Metro Health whose identities are presently unknown to Plaintiff but are believed to include persons who participated in custody, transport, restraint, monitoring, or medical coordination and whose identities will be determined in discovery.

29. At all times relevant herein, Tasha Grant, was under the joint and/or several care of the aforementioned Defendants.

**FACTS**

30. Where the Complaint alleges facts on information and belief, Plaintiff will have evidentiary support after reasonable investigation and discovery, and the allegations are made because the facts are peculiarly within Defendants' knowledge and control.

31. Tasha Grant was a 39 year-old mother of one child.

32. Ms. Grant suffered from multiple medical and psychiatric conditions including end

stage renal disease, type 1 diabetes, bipolar disorder, schizophrenia, and borderline personality disorder. Ms. Grant was a double below-the-knee amputee.

33. Ms. Grant used supportive therapeutic measures, including pet therapy and art therapy, to manage her medical and psychiatric conditions.

34. On or about April 17, 2025, Ms. Grant was arrested and incarcerated at the Cuyahoga County Jail for disorderly conduct.

35. At the time of her incarceration, Ms. Grant was in a wheelchair and required multiple prescription medications for treatment of her serious medical and psychiatric needs.

36. While incarcerated, Ms. Grant's wheelchair was broken, and jail personnel failed to provide necessary medications and accommodations for her serious medical and psychiatric conditions.

37. On or about May 2, 2025, Ms. Grant began suffering severe chest pain and was transported by Cuyahoga County Sheriff's Department to the MetroHealth Medical Center.

38. During transport, Ms. Grant told the transporting deputy that she was upset, afraid, and scared, placing him on notice that she was in acute distress.

39. Upon arrival at the emergency department of MetroHealth Medical Center, Ms. Grant was examined by a resident and by emergency room physician, Sandra Najarian, M.D.

40. Dr. Najarian ordered and approved of a variety of tests to be done on Ms. Grant, including an echocardiogram, which was noted to be grossly abnormal with an ejection fraction of 35%. Dr. Najarian failed to respond appropriately to the grossly abnormal echocardiogram, hypertensive emergency, and other signs of acute cardiopulmonary compromise, and instead ordered only Lasix for fluid.

41. Ms. Grant was admitted from the emergency department to MetroHealth Medical

9

Center where she came under the care of hospitalists Ana Glavan, M.D., Josue Davila, M.D., and William Petro, M.D., all of whom were aware of Ms. Grant's serious medical and psychiatric conditions.

42.     Upon her admission as an in-patient, Dr. Glavan ordered that Ms. Grant undergo a psychiatric consultation and ordered that she be continued on violent care plan.

43.     Additional cardiac testing was ordered to assess Ms. Grant's condition, but Defendants failed to ensure that the testing was timely completed or followed up.

44.     Ms. Grant was seen by psychiatrist, Aasia Syed, M.D.  She told Dr. Syed that she was scared for her life.  Dr. Syed recommended sitter observation for Ms. Grant, but no sitter was ordered or provided despite Ms. Grant's continuing distress and vulnerability.

45.  Ms. Grant continued to complain of difficulty breathing for several days, yet nothing was done to alleviate the condition.

46. Ms. Grant continued to report that she was scared, that she had chest pains, and that she had difficulty breathing but her consistent pleas for help were ignored by all medical staff at MetroHealth Medical Center.

47. Ms. Grant's mental health needs continued to be ignored and she was seen as a trouble maker.  The only concern was to get her out of the hospital and back to the jail.

48. By May 5, 2025, Ms. Grant's medical condition had deteriorated. She had severe systolic heart failure, worsening renal function, and critically elevated potassium.

49. The aforementioned conditions created a foreseeable risk of fatal arrhythmia.

50.     The restraint, sedation, respiratory complaints, and failure to continuously monitor Ms. Grant compounded that risk.

10

51. Ms. Grant's death was caused by the combined effects of untreated medical instability, restraint, sedation, and failure to monitor or intervene in the face of obvious respiratory and cardiopulmonary distress.

52. On or about May 5, 2025 in the late afternoon, Ms. Grant suffered a mental crisis and medical crisis. She gasped more than 23 times that she could not breathe.

53. Ms. Grant's medical providers ordered that she be given Olanzapine, a sedative that can slow breathing.

54. Officers Mazaran, Alemane, and Deputy Tucciarone of the MetroHealth Police Department were called to Ms. Grant's room, along with Deputy Coffey.

55. The officers were familiar with Tasha Grant and knew she suffered from mental health issues.

56. In response to Ms. Grant's screams that she could not breathe she was told by the officers that "you're yelling so you can breathe".

57. Officer Mazaran and Deputy Tucciarone restrained Ms. Grant to the bed and Officer Alemane held her against the bed. The sedative was injected at approximately 5:23 p.m.

58. Deputy Coffey handcuffed Ms. Grant to the bed.

59. Ms. Grant was forced to remain on her stomach for an extended time and was left lying handcuffed to the bed until she stopped gasping and became unresponsive.

60. Ms. Grant was found unresponsive in her bed by Dr. Davila and a code was called at 5:52 p.m.

61. Tasha Grant was pronounced dead at 6:29 p.m. on May 5, 2025.

62. The restraint, sedation, and failure to monitor occurred in the setting of known cardiac disease, renal dysfunction, respiratory complaints, and disability-related mobility

11

limitations. Those facts made the risk of respiratory compromise, cardiac deterioration, and death obvious to reasonable officers and medical providers.

63. The immediate cause of Ms. Grant's  death was reported as Physical Restraint in the Setting of Congestive Heart Failure.

64. Tasha Grant is survived by her child, her father, and a myriad of other relatives and friends who loved her.

65. At all relevant times, Ms. Grant was in custody and had not been convicted or sentenced on the charges for which she was being held. She was therefore a pretrial detainee protected by the Fourteenth Amendment.

66. In the alternative, to the extent any Defendant contends otherwise, Defendants' conduct violated clearly established constitutional protections applicable to persons in government custody with serious medical needs.

### FIRST CLAIM FOR RELIEF
**42 U.S.C. § 1983 - Fourteenth Amendment**
**Deliberate Indifference/Objectively Unreasonable Response to Serious Medical Needs of a Pretrial Detainee**
**(Against Defendants Mazaran, Alemane, Tucciarone, Coffey and John/Jane Does)**

67. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

68. Defendants Mazaran, Alemane, Tucciarone, Coffey, and John/Jane Doe officers acted under color of state law and subjected Ms. Grant, a pretrial detainee, to an objectively unreasonable response to her serious medical needs in violation of the Fourteenth Amendment.

69. A pretrial detainee asserting a Fourteenth Amendment medical-care claim must show that she had an objectively serious medical need and that each defendant acted intentionally or recklessly in the face of an unjustifiably high risk of harm that was known or so obvious it should have been known. Ms. Grant's repeated pleas that she could not breathe, severe cardiac

disease, acute medical instability, psychiatric distress, sedation, restraint, and eventual unresponsiveness presented obvious and serious medical needs requiring immediate monitoring, intervention, and escalation.

70. Serious psychiatric needs constitute serious medical needs under the Fourteenth Amendment. *Comstock v. McCrary,* 273 F. 3d 693, 703 (6th Cir. 2001).

71. Correctional officers, like Defendants Mazaran, Alemane, Tucciarone, and Coffey violate an incarcerated person's constitutional rights when they intentionally deny or delay a person's access to medical care for serious medical need. *Blackmore v. Kalamazoo Cty.*, 390 F. 3d 890, 895 (6th Cir. 2004), citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1975)

72. Correctional officers who have "been alerted to a prisoner's serious medical needs are under an obligation to offer medical care to such a prisoner." *Comstock,* 273 F. 3d at 702.

73. When a corrections official actually knew about an inmate's serious psychiatric condition but failed to seek appropriate medical or psychiatric care for the inmate, the corrections officer's "particular conduct" violates clearly established law and is deliberately indifferent. *Estate of Clark v. Walker*, 865 F. 3d 544, 553 (6th Cir. 2017).

74. It is not per se reasonable for corrections officers to automatically defer to medical staff. This deference is unreasonable when the officer has knowledge of additional information regarding the inmate's condition or if the inmate's condition changes after medical staff's evaluation. *Grote v. Kenton County*, 85 F. 4th 397, 413 (6th Cir. 2023). The officers' constitutional duty was not discharged merely because Ms. Grant was under the care of medical personnel if they knew or had reason to know she remained in obvious danger. *Clark-Murphy v. Foreback*, 439 F. 3d 280, 289-90 (6th Cir. 2006).

75. Here, Ms. Grant was seen by medical staff at MetroHealth Medical Center but

Defendants Mazaran, Alemane, Tucciarone, and Coffey witnessed her continued deterioration and left knowing that they did not provide the necessary care for Ms. Grant.

76. Based on the foregoing facts, each of Defendants Mazaran, Alemane, Tucciarone, and Coffey personally participated in conduct that was objectively unreasonable and deliberately indifferent to Ms. Grant's serious medical needs, including, but not limited to:

a. Defendants John Doe 1-10 failed to provide safe, secure and humane transportation for Ms. Grant when she told them that she was afraid and scared;

b. Defendant Tucciarone stated, in substance, that he and his staff were familiar with Ms. Grant and that her distress was 'normal for her,' thereby treating an obvious medical emergency as ordinary behavior and failing to obtain timely intervention.

c. When screaming that she could not breathe, at least 23 times, Defendants Mazaran, Alemane, Tucciarone, or Coffey told her that "you're yelling so you can breathe".

d. Defendants Tucciarone and Mazaran forcibly restrained Ms. Grant to her bed while Defendant Coffey handcuffed her to the bed and Defendant Alemane held her against the bed while she was injected with medication.

e. Defendants Tucciarone, Mazaran, Alemane, and Coffey ignored Ms. Grant's continued pleas for help.

f. Defendants Mazaran, Alemane, Tucciarone, and Coffey failed to provide verbal welfare checks and visual monitoring by leaving Ms. Grant handcuffed to the bed, on her stomach for at least 14 minutes.

g. Defendant Tucciarone knew Ms. Grant was medically and psychiatrically vulnerable, stated words to the effect that staff were familiar with her and that this behavior was normal for her, participated in restraining her to the bed, heard or was present for her repeated statements that she could not breathe, and failed to require repositioning, monitoring, or medical reassessment.

h. Defendant Mazaran participated in physically restraining Ms. Grant while she was medically unstable, heard or was present for her repeated respiratory complaints, failed to slow the encounter, failed to modify restraint for her bilateral amputations, and failed to intervene when she was left restrained and medically vulnerable.

14

i.  Defendant Alemane held Ms. Grant against the bed while she was in distress, heard or was present for her repeated statements that she could not breathe, failed to intervene to reposition her, and failed to require continuous monitoring after restraint and sedation.

j.  Defendant Coffey handcuffed Ms. Grant to the bed while she was sedated, medically unstable, and positioned in a manner that created obvious respiratory and cardiac risk. Coffey failed to conduct or require meaningful welfare checks, visual monitoring, repositioning, or medical reassessment before Ms. Grant became unresponsive.

77. A cardiac condition is an objectively serious medical need. *Mercer v. Athens County,* 72 F. 4th 152, 161 (6th Cir. 2023)*, citing* *Howell v. NaphCare, Inc.*, 67 F. 4th 302, 311 (6th Cir. 2023).

78.  Defendants deliberately chose to ignore Ms. Grant's serious medical needs, thus recklessly disregarding the obviously and unjustifiably high risk that Ms. Grant suffered.

79. The conduct of Defendants Mazaran, Alemane, Tucciarone, Coffey and John Does 1-10 was a direct and proximate cause of Ms. Grant's injuries, including her pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival

80. Defendants Mazaran, Alemane, Tucciarone, Coffey and John Does 1-10 directly and proximately caused the injuries and damages to Ms. Grant, her family, and her Estate.

**SECOND CLAIM FOR RELIEF**
**42 U.S.C. § 1983- Fourteenth Amendment Supervisory Liability**
**Against Defendant Greiner and Any Identified Supervisory Defendants in Their Individual Capacities**

81.  Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

82.  Defendant Greiner was personally responsible, as Chief of Police, for the training, supervision, discipline, and operational policies governing MetroHealth Police officers and knew or should have known of the obvious risks created by inadequate restraint and monitoring practices.

15

83. Defendant Greiner knew or should have known that MetroHealth Police officers would be required to restrain, guard, and interact with medically fragile detainees inside MetroHealth, including detainees with mobility limitations, psychiatric distress, and serious cardiopulmonary risks.

84. Defendant Greiner failed to ensure that MetroHealth Police officers were trained and supervised to avoid prone, semi-prone, or abdomen-compressing restraint of medically fragile or disabled detainees; to recognize respiratory distress; to obtain medical intervention when a detainee repeatedly states she cannot breathe; and to coordinate with medical staff before and after restraint and sedation.

85. These failures caused or contributed to the unconstitutional restraint, failure to monitor, and failure to protect Ms. Grant from obvious medical danger.

86. Greiner's acts and omissions, including his failure to train, supervise, or correct known deficiencies, were a direct and proximate cause.

87. Defendants are jointly and severally liable for this conduct.

### THIRD CLAIM FOR RELIEF
### Ohio Survival Claim, R.C. § 2305.21 – Willful, Wanton, or Reckless Conduct Against Coffey, Mazaran, Alemane, Tucciarone, and John/Jane Doe Officers

88. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

89. Defendants Coffey, Mazaran, Alemane, and Tucciarone, as law-enforcement officers and custodial actors, each owed Ms. Grant duties under Ohio law to exercise reasonable care and to refrain from willful, wanton, or reckless conduct.

90. Defendants Coffey, Mazaran, Alemane, and Tucciarone each violated their duties to exercise reasonable care and acted recklessly, willfully, and/or wantonly while serving as law-enforcement and custodial actors responsible for Ms. Grant's safety.

16

91. Defendants Coffey, Mazaran, Alemane, and Tucciarone each recklessly breached their duty of care to Ms. Grant and proximately caused injuries to Ms. Grant, her family, and her estate.

92. The conduct of Defendants Coffey, Mazaran, Alemane, and Tucciarone was a direct and proximate cause of Ms. Grant's injuries, including pain and suffering, emotional trauma, pre-death agony, death, and lost chance for treatment and survival.

93. Defendants are jointly and severally liable for this conduct.

**FOURTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 Fourteenth Amendment – *Monell* claim for Deliberate Indifference to Serious Medical Needs of Pretrial Detainees**
**Against Defendants Cuyahoga County and MetroHealth**

94. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

95. Defendants Cuyahoga County and MetroHealth maintained policies, customs, practices, and training failures that were the moving force behind the violation of Ms. Grant's constitutional rights.

96. These policies and customs included treating medically fragile detainees as security problems rather than patients requiring constitutional medical care; failing to require meaningful coordination between custody staff, hospital police, and medical providers; failing to train officers and medical staff to recognize respiratory distress during restraint; failing to train on positional/restraint asphyxia; failing to require disability-modified restraint for detainees with obvious mobility limitations; and failing to require continuous monitoring after restraint and sedation.

97. These failures were known or obvious because Cuyahoga County's own policies recognized the need for humane transport, welfare checks, visual observation, disability accommodation, medical assessment, and monitoring of restrained detainees. MetroHealth

17

likewise knew that Ms. Grant was a hospitalized detainee with serious cardiac disease, renal disease, psychiatric distress, and bilateral below-knee amputations.

98. Despite that knowledge, Defendants failed to implement, enforce, train on, and supervise compliance with those safety requirements.

99. These failures were not abstract. They manifested in this incident when officers and medical staff treated Ms. Grant's respiratory distress as behavioral defiance, dismissed her repeated statements that she could not breathe, failed to modify restraint for a bilateral amputee, failed to reposition her once controlled, failed to conduct continuous welfare checks, failed to continuously monitor her after sedation, and left her restrained in a position that created obvious cardiopulmonary risk.

100. These failures were the predictable result of Defendants' training, supervision, and policy choices.

101. Cuyahoga County's own transport and restraint policies recognized the need for humane transport, welfare checks, visual observation, disability accommodation, and medical assessment of detainees who cannot sit upright or safely comply with ordinary commands. The conduct alleged here departed from those known safety requirements in ways that were foreseeable and preventable.

102. The policies, practices and/or customs alleged in this complaint, separately and together, are the proximate cause of the injuries and death of Tasha Grant.

103. These policies, practices, and/or customs, including a failure to discipline, retrain, or correct known unsafe restraint and monitoring practices by Defendants Cuyahoga County, its Sheriff's office, and MetroHealth Police Department, made officers like Coffey, Mazaran,

18

Alemane, and Tucciarone believe they would not face discipline or other consequences for their unconstitutional actions.

104. The interrelated policies, practices and customs, as alleged in this complaint, individually and together, were maintained and implemented with deliberate indifference and encouraged the Defendants to commit the acts against Tasha Grant alleged in this complaint.

105. Defendants Cuyahoga County, its Sheriff's Department, and MetroHealth therefore acted as the moving force behind and the direct and proximate causes of the violations of Tasha Grant's constitutional rights and all injuries and damages suffered by her, her Estate, and her beneficiaries.

106. Upon information and belief, Defendants failed to enforce written safety requirements concerning humane transport, welfare checks, visual observation, disability accommodation, medical assessment, and monitoring of restrained detainees.

107. Defendants are jointly and severally liable for this conduct.

**FIFTH CLAIM FOR RELIEF**
**42 U.S.C. § 1983 – Fourteenth Amendment**
**Objectively Unreasonable Force Against a Pretrial Detainee**
**Against Defendants Coffey, Mazaran, Alemane, Tucciarone, and John/Jane Does**

108. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

109. Defendants used objectively unreasonable force against Ms. Grant under the totality of the circumstances.

110. Ms. Grant was a medically fragile double below-knee amputee, inside a hospital room, surrounded by multiple officers and medical personnel, unarmed, and repeatedly stating that she could not breathe.

111. Rather than slow the encounter, use de-escalation, modify restraint, or summon

19

medical intervention, Defendants forced Ms. Grant into a dangerous restraint position, handcuffed her to the bed, allowed sedation, dismissed her respiratory distress, and left her restrained and medically vulnerable until she became unresponsive.

112.    Defendants Coffey, Mazaran, Alemane, and Tucciarone, acting under color of state law, used objectively unreasonable force against Ms. Grant under the totality of the circumstances by restraining her in a manner that created an obvious risk of serious harm.

113.    The force used was disproportionate to any legitimate governmental need, ignored Ms. Grant's obvious medical vulnerability, and created a foreseeable risk of serious injury or death.

114.    Defendants' conduct violated Ms. Grant's rights under the Fourteenth Amendment and was a direct and proximate cause of her conscious pain and suffering, death, and damages to her Estate and beneficiaries.

115.    Defendants are jointly and severally liable for this conduct.

### SIXTH CLAIM FOR RELIEF
**Ohio Medical Negligence/Medical Malpractice**
**Against Defendants The MetroHealth System, Sandra Najarian, M.D., Ana Glavan, M.D., Josue Davila, M.D., William Petro, M.D., Aasia Syed, M.D., and John/Jane Doe Medical Providers**

116.    Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

117.    Plaintiff asserts this Ohio medical claim under this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367. Plaintiff pleads this claim pursuant to the Federal Rules of Civil Procedure and does not concede that Ohio Civ.R. 10(D)(2) governs this federal pleading.

118.    At all relevant times, Defendants owed Ms. Grant a duty to exercise the degree of

20

care, skill, and diligence ordinarily exercised by reasonably prudent physicians and hospital providers under similar circumstances.

119. Defendants breached those duties by failing to timely recognize, monitor, treat, and escalate Ms. Grant's serious medical conditions, including severe systolic heart failure, acute renal deterioration, hyperkalemia, psychiatric distress, respiratory distress, and the known risks associated with restraint and sedation.

120. Upon information and belief, while Ms. Grant was incarcerated at the Cuyahoga County Jail, MetroHealth and its agents failed to provide necessary medications and mental-health treatment despite knowledge of her serious medical and psychiatric conditions.

121. On or about May 2, 2025, Ms. Grant was transported from the Cuyahoga County Jail to The MetroHealth System for complaints of severe chest pain and difficulty breathing.

122. Upon arrival, Ms. Grant was evaluated in the emergency department, where testing revealed serious cardiac abnormalities, including an ejection fraction of approximately 35%, severe hypertension, fluid overload, and other evidence of significant cardiopulmonary compromise.

123. Defendants failed to timely and appropriately account for those findings in Ms. Grant's treatment plan, monitoring, medication management, and level of care.

124. After admission, Ms. Grant continued to report fear, chest pain, difficulty breathing, psychiatric distress, and concern for her safety, yet Defendants failed to provide appropriate monitoring, escalation, psychiatric intervention, sitter observation, and coordinated care.

21

125. By May 5, 2025, Ms. Grant's condition had further deteriorated. She had worsening renal function and critically elevated potassium, creating a foreseeable risk of fatal arrhythmia in the setting of severe systolic heart failure.

126. Defendants failed to timely and adequately treat, monitor, reassess, and escalate care for Ms. Grant's acute renal deterioration, hyperkalemia, cardiopulmonary instability, and psychiatric crisis.

127. Defendants further failed to ensure completion of ordered or medically necessary testing, including cardiac or electrocardiographic evaluation, and failed to adequately respond to abnormal findings and incomplete testing.

128. In the afternoon of May 5, 2025, Ms. Grant was physically restrained and sedated while medically unstable. Defendants knew or should have known that sedating and restraining a medically fragile patient with severe cardiac disease, respiratory complaints, renal deterioration, and acute metabolic instability required heightened precautions and continuous monitoring.

129. Defendants failed to ensure that Ms. Grant was continuously monitored after restraint and sedation, including monitoring of respiratory status, cardiac status, oxygenation, vital signs, and level of consciousness.

130. Defendants failed to intervene, reposition, reassess, or escalate care despite Ms. Grant's repeated statements that she could not breathe, her known medical vulnerability, and the obvious risk created by restraint, sedation, and cardiopulmonary compromise.

131. Defendants failed to timely recognize Ms. Grant's deterioration and unresponsiveness.

132. Defendant Davila and the other responding medical providers failed to timely

22

recognize and respond to Ms. Grant's deterioration, including her cardiopulmonary arrest and the underlying conditions that precipitated it.

133. The departures from accepted standards of care by Defendants included, but were not limited to:

    a. failing to provide necessary medications and treatment while Ms. Grant was in custody;

    b. failing to adequately evaluate and treat severe hypertension, fluid overload, and abnormal cardiac findings;

    c. failing to ensure appropriate cardiac monitoring and follow-up testing;

    d. failing to timely recognize and treat worsening renal function and hyperkalemia;

    e. failing to timely escalate Ms. Grant's care to a higher level of monitoring or intervention;

    f. failing to provide appropriate psychiatric intervention, sitter observation, and crisis stabilization;

    g. failing to account for the respiratory and cardiac risks of sedation in a medically fragile patient;

    h. failing to continuously monitor Ms. Grant after sedation and restraint;

    i. failing to respond appropriately to Ms. Grant's repeated complaints that she could not breathe;

    j. failing to coordinate medical and security decisions to protect Ms. Grant from foreseeable harm; and

    k. failing to timely recognize and respond to Ms. Grant's unresponsiveness and cardiopulmonary arrest.

134. As a direct and proximate result of Defendants' departures from accepted standards of care, Ms. Grant suffered conscious pain and suffering, respiratory distress, cardiopulmonary compromise, loss of chance of survival, death, and damages to her Estate and beneficiaries.

135. Defendants' negligence and departures from accepted standards of care were a direct and proximate cause of Ms. Grant's injuries, death, and damages.

## SEVENTH CLAIM FOR RELIEF
### Ohio Revised Code § 2125.01 et seq.-Wrongful Death

136. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

137. Plaintiff states that as a direct and proximate result of the negligence, recklessness, wantonness, willfulness, and malpractice of the Defendants, jointly and severally, Tasha Grant met her death on May 5, 2025.

138. Tasha Grant left surviving her minor child, her father, and other next-of-kin for whose benefit this action is sought.

139. As a direct and proximate result of the wrongful conduct and malpractice of the Defendants, jointly and severally, as aforesaid, Tasha Grant's children, father and other next-of-kin, have been deprived of Tasha Grant's loss of support, loss of services, loss of society, loss of companionship, loss of consortium, loss of care, loss of assistance, loss of attention, loss of protection, loss of advice, loss of guidance, loss of counsel, loss of instruction, loss of training, loss of education, loss of prospective inheritance, and have suffered emotional trauma and mental anguish by reason of the wrongful death of the decedent.

140. Plaintiff has incurred funeral expenses in an amount yet to be determined by reason of the wrongful death of Tasha Grant.

## EIGHTH CLAIM FOR RELIEF
### Ohio Revised Code § 2305.21 - Survivorship

141. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

142. As a direct and proximate result of the joint and several wrongful conduct of the

Defendants, as aforesaid, Tasha Grant suffered severe and permanent injuries, resulting in her death.

143. As a direct and proximate result of the joint and several wrongful conduct of the Defendants, as aforesaid, Tasha Grant suffered a complete loss of enjoyment of life.

144. As a direct and proximate result of Defendants' wrongful conduct, Ms. Grant experienced conscious pain and suffering, fear, respiratory distress, emotional anguish, loss of enjoyment of life, and pre-death terror before becoming unresponsive and dying.

**NINTH CLAIM FOR RELIEF**
**Violation of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794**

145. Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

146. At all relevant times, Tasha Grant was a qualified individual with disabilities within the meaning of the ADA and Rehabilitation Act.

147. Ms. Grant's disabilities included, but were not limited to, bilateral below-knee amputations, mobility impairment requiring wheelchair use, serious cardiac disease/congestive heart failure, chronic kidney disease, diabetes, and psychiatric disabilities.

148. Defendants Cuyahoga County and The MetroHealth System are public entities and, upon information and belief, recipients of federal financial assistance subject to Title II of the ADA and Section 504 of the Rehabilitation Act.

149. Ms. Grant was in Defendants' custody, care, and control and was entitled to equal access to safe custodial handling, medical care, hospital services, transport, restraint practices, crisis response, and monitoring.

150. Defendants knew or should have known of Ms. Grant's disabilities. Her bilateral

amputations and wheelchair dependence were obvious. Her cardiac, renal, diabetic, and psychiatric conditions were documented in her medical and custodial records and known to Defendants' employees and agents.

151. Defendants failed to make reasonable modifications to their policies, practices, and procedures where such modifications were necessary to avoid discriminating against Ms. Grant by reason of her disabilities.

152. These failures included, but were not limited to:

a. failing to modify restraint techniques for a double amputee who could not safely stand, reposition herself, or relieve pressure from her chest, abdomen, and diaphragm;

b. using prone, semi-prone, or abdomen-compressing restraint despite her mobility limitations and known cardiopulmonary risk;

c. failing to provide safe mobility assistance and disability-appropriate handling during the encounter;

d. failing to distinguish between disability-related distress, fear, pain, psychiatric symptoms, and inability to comply with commands on the one hand, and misconduct on the other;

e. issuing impossible or unreasonable commands, including commands to "stand up," despite Ms. Grant's bilateral amputations and physical position;

f. failing to provide effective crisis de-escalation despite evidence that Ms. Grant responded to calm communication, reduced stimulation, and individualized calming measures;

g. failing to provide reasonable psychiatric and behavioral-health accommodations, including meaningful access to mental-health support, sitter observation, communication support, and de-escalation measures;

h. failing to continuously monitor Ms. Grant after restraint and sedation despite her disabilities and heightened risk of respiratory or cardiac compromise;

i. failing to coordinate medical and security decisions to ensure that custody procedures did not deny or interfere with medically necessary care;

26

    j.    failing to train and supervise officers, deputies, hospital police, medical staff, and other employees on disability-related restraint risks and reasonable modifications for disabled detainees and patients.

153.    This claim is based on Defendants' failure to reasonably modify custodial, restraint, transport, communication, crisis-response, and monitoring practices for a disabled detainee. It is not based merely on disagreement with medical judgment.

154.    Ms. Grant's disability-related limitations — including bilateral amputations, wheelchair dependence, inability to safely stand or reposition herself, psychiatric distress, and serious cardiopulmonary vulnerability — required reasonable modifications to ordinary security and hospital-police practices. Defendants instead treated those limitations as defiance and noncompliance.

155.    Defendants' employees and agents acted with deliberate indifference to Ms. Grant's federally protected rights. They knew that Ms. Grant had obvious and documented disabilities and that reasonable modifications were necessary, yet failed to take available and reasonable steps to protect her.

156.    Reasonable modifications were available and feasible, including slowing the encounter, limiting the number of officers involved, using calm communication, obtaining mental-health assistance, avoiding prone or abdomen-compressing restraint, repositioning Ms. Grant once controlled, assigning continuous observation, and conducting respiratory and cardiac monitoring after sedation and restraint.

157.    Defendants' violations were a direct and proximate cause of Ms. Grant's conscious pain and suffering, respiratory distress, medical deterioration, death, and damages to her Estate and beneficiaries.

158.    Plaintiff seeks compensatory damages, attorney's fees, costs, and all other relief

permitted under the ADA and Rehabilitation Act.

## TENTH CLAIM FOR RELIEF
### Declaratory Judgment and Determination of Any Medicaid Recovery Interest
### (Against Ohio Department of Medicaid)

159.    Plaintiff incorporates all foregoing paragraphs as if fully rewritten herein.

160.    Upon information and belief, the Ohio Department of Medicaid may assert or has asserted a statutory recovery, reimbursement, lien, or subrogation interest arising from medical assistance paid on behalf of Tasha Grant in connection with the events described in this Complaint.

161.    Plaintiff seeks a declaration determining whether ODM has any valid recovery interest against the proceeds of this action, and if so, the nature, scope, priority, and amount of any such interest under applicable federal and Ohio law, including Ohio Revised Code Chapter 5160 and any other applicable recovery provisions.

162.    Plaintiff further seeks an order requiring ODM to disclose the basis and amount of any claimed recovery interest, including the dates and amounts of payments allegedly made on behalf of Tasha Grant, any payments claimed to be related to the injuries alleged here, and any statutory or contractual basis for reimbursement.

163.    Plaintiff does not seek damages from ODM on the merits of the underlying constitutional, negligence, or wrongful death claims, but includes ODM solely to resolve any asserted recovery interest efficiently and to avoid later collateral litigation over the amount or validity of any lien, reimbursement claim, or statutory recovery right.

164.    Plaintiff seeks such further relief as is just and proper.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff prays for judgment against Defendants, jointly and severally where permitted by law, as follows:

A. Compensatory damages in an amount to exceed $25,000.00;

B. Punitive damages in an amount to exceed $25,000.00;

C. Funeral expenses in an amount yet to be determined;

D. Pre-judgment and post judgment interest:

E. Attorney fees and costs, including fees recoverable under 42 U.S.C. § 1988, the ADA, the Rehabilitation Act, and other applicable law; and for

F. Such other and further relief to which they may be entitled.

Respectfully submitted,

*/s/ Robert L. Gresham*
Michael L. Wright, #0067698
Robert L. Gresham, #0082151
WRIGHT & SCHULTE
130 W. Second Street, Suite 1600
Dayton, Ohio 45402
(937) 222-7477
(937) 222-7911          FAX
mwright@yourohiolegalhelp.com
rgresham@yourohiolegalhelp.com


*/s/ Stanley Jackson*
Stanley Jackson, #0077011
2000 Auburn Drive, Suite 200
Beachwood, Ohio 44122
(216) 333-3333
(513) 672-0184          FAX
sjackson@cochranohio.com

29

## **JURY DEMAND**

Plaintiff respectfully demands a trial by jury on all issues presented herein.

/s/ Robert L. Gresham
Michael L. Wright, #0067698
Robert L. Gresham, #0082151
WRIGHT & SCHULTE
130 W. Second Street, Suite 1600
Dayton, Ohio 45402
(937) 222-7477
(937) 222-7911          FAX
mwright@yourohiolegalhelp.com
rgresham@yourohiolegalhelp.com

/s/ Stanley Jackson
Stanley Jackson, #0077011
2000 Auburn Drive, Suite 200
Beachwood, Ohio 44122
(216) 333-3333
(513) 672-0184          FAX
sjackson@cochranohio.com